UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
KRISPY KREME DOUGHNUT
CORPORATION, et ano.

                Plaintiffs,

         -against-                              10 Civ. 4272 (LAK)

SATELLITE DONUTS, LLC, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

          Appearances:

                David M. Siegal
                Jonathan Pressment
                HAYNES AND BOONE, LLP
                *Attorneys for the Plaintiffs*

                Justin M. Klein
                MARKS & KLEIN LLP
                *Attorney for the Defendants*

LEWIS A. KAPLAN, *District Judge.*

          This action arises out of the purported termination of two franchise agreements by plaintiffs Krispy Kreme Doughnut Corporation and Northeast Doughnuts, LLC (collectively, "Krispy Kreme").  The complaint alleges, among other things, that the defendants have defaulted on their obligations under the agreements and that their continued use of Krispy Kreme's trademarks

is unlawful under the Lanham Act.[1]  The matter is before the Court on Krispy Kreme's motion for a preliminary injunction enjoining defendants from operating the franchises.

*Facts*

*The Franchises*

On September 17, 2008, Krispy Kreme and defendant Satellite Donuts, LLC ("Satellite") entered into a franchise agreement pursuant to which Satellite agreed operate a Krispy Kreme franchise at Penn Station in Manhattan (the "Penn Station Franchise Agreement").[2]  The following year, on July 10, 2009, Satellite executed a Promissory Note (the "Note") in the amount of $150,000 in favor of Krispy Kreme.  A portion of the principal amount of the Note represented outstanding invoices accrued and payable to Krispy Kreme as of the date of the Note.[3]  Several months later, Satellite entered into a franchise agreement for the operation of a Krispy Kreme franchise in Baldwin, New York (the "Baldwin Franchise Agreement" and, together with the Penn Station Franchise Agreement, the "Agreements").[4]

The Agreements grant Satellite licenses to use Krispy Kreme's trademarks, trade

---

[1]    15 U.S.C. § 1114.

[2]    Stip. Fact ¶ 1.

[3]    *Id.* ¶ 5.

[4]    *Id.* ¶ 3.

The Baldwin franchise is a commissary facility, which manufactures doughnuts and other products sold at the Penn Station franchise.  *Id.* ¶¶ 7-8.

dress, and proprietary information.[5]   Satellite's principals, defendants Alexander McCourt and

Errington Walters, personally guaranteed Satellite's performance under the Agreements.[6]

Paragraph 13.2 of the Agreements requires that Satellite pay royalty fees to Krispy

Kreme on a weekly basis.[7]  The Agreements provide also that Satellite would pay Krispy Kreme for

products, ingredients, and advertising.[8]  Paragraph 26, entitled "Termination of Franchise," provides

that:

> "Franchisor has the right to terminate this Agreement, effective upon delivery of
> notice of termination to Franchisee, if Franchisee or any of its Principal Owners or
> Affiliates . . . fails to report accurately Net Sales, to establish, maintain and/or have
> sufficient funds available in the Account as required by Section 13.3 or fails to make
> payment of any amounts due Franchsior or any of its Affiliates, and does not correct
> such failure within ten (10) days after written notice of such failure is delivered to
> Franchisee."[9]

Upon termination of the Agreement, Satellite shall "not directly or indirectly at any time or in any

---

[5]

Id. ¶¶ 9-10.  The franchisee "acknowledges that Franchisee's right to use the Marks is
derived solely from th[e Franchise] Agreement and is limited to the performance of
Franchisee's responsibilities and obligations hereunder and in accordance with the terms
hereof."  Franchise Agreement, Cpt. Ex. A, ¶ 16.1.

[6]

Stip. Fact ¶¶ 2, 4.

[7]

Cpt. Ex. A ¶ 13.2.

[8]

Id. ¶¶ 9.3, 22.1.  The Agreements provide that "Franchisor may require Franchisee to
purchase any or all of the equipment, fixtures, furnishings, sings, delivery vehicles, raw
materials, supplies, and other items for the STORE directly from Franchisor or its affiliates
. . . ."  Id. ¶ 9.3.  Further, "Franchisee hereby authorizes the Franchisor to initiate debit
entries and/or create entries to the Account for payments of Royalties, and other amounts
payable under this Agreement, including purchases for production equipment, fixtures,
furnishings, doughnut mixes, and other ingredients, packaging and all supplies purchased
from Franchisor and any interest charges due thereon."  Id. ¶ 13.3.

[9]

Id. ¶ 26.2.

4

manner use any Mark, any colorable imitation of any Mark or any other indicia of a Krispy Kreme Store or Commissary Facility."[10]

In late 2009, C.W. Burton, a Krispy Kreme employee, "promised to defer royalty payments for ingredients purchased, stating 'we'll park it off to the side and we'll deal with it another day.'" Burton advised McCourt to "continue paying on your note and paying for product on C.O.D. basis, and we'll deal with the account on another day."[11]

As of May 12, 2010, Satellite owed Krispy Kreme royalty, brand fund, and product fees due under the Agreements.[12]  On that day, Krispy Kreme hand-delivered a letter to Satellite entitled "Notice of Default and Demand for Payment" (the "Default Notice"), which alleged that "Satellite has failed to make payments of amounts due to Krispy Kreme totaling $310,046.16 as of May 4, 2010."[13]  The Default Notice stated that Krispy Kreme would have the right to terminate the Agreements if defendants did not cure the default within ten days.

On May 14, McCourt informed Burton that a third party was willing to invest in Satellite.  Burton, however, replied that it was "'too late in the game' to begin the process of approving a third party to come in as an investor in the franchise."[14]  Burton refused to extend the

---

[10]

    *Id.* ¶ 27.2.

[11]

    McCourt Decl. [DI 9] ¶ 42.

[12]

    Stip. Fact ¶ 11.

[13]

    *Id.* ¶ 12-13.  Cpt. Ex. F.  The complaint, however, alleges that the amount owed under the Agreements is $121,094.10.  Cpt. ¶¶ 68-69.

[14]

    McCourt Decl. ¶ 47.

period in which defendants could cure the default.[15]

Defendants did not tender any money to Krispy Kreme between May 12, 2010 and May 23, 2010 and concededly did not cure their defaults.[16]  Indeed, they concede that Satellite "has incurred debt in excess of $235,000 to Krispy Kreme, including the note which has a current balance of substantially less. . . . The debt relates to royalties, note payments, and approved products and brand fund."[17]

On May 23, 2010, Krispy Kreme delivered to defendants a letter entitled "Re: Former Krispy Kreme Stores #860 and 864 NOTICE TO CEASE AND DESIST" (the "May 23 Letter").[18] The letter states that defendants "have failed to cure the defaults specified in the [Default Notice] within the specified cure period.  Consequently, the Penn Station Franchise Agreement and the Baldwin Franchise Agreement were terminated effective May 23, 2010."[19]  It states also that defendants no longer "have authorization from Krispy Kreme to use its trade name, trademarks, service marks, or any other proprietary materials or products associated with Krispy Kreme."[20]

---

[15]

*Id.*

[16]

Stip. Fact ¶¶ 14-15.

[17]

Def. Mem. 8.

[18]

Stip Fact ¶ 18; Cpt. Ex. G.

[19]

Cpt. Ex. G.

[20]

*Id.*

*This Action*

Krispy Kreme brought this action on May 27, 2010 and moved by order to show cause for a temporary restraining order and a preliminary injunction enjoining defendants from operating the franchises and from using Krispy Kreme's trademarks and proprietary information. It alleged, among other things, that defendants were infringing Krispy Kreme's marks by continuing to run the franchises without authorization and were diluting the marks by making substandard doughnuts.[21]

This Court granted a temporary restraining order permitting Krispy Kreme "to have a quality control manager on site" at the Penn Station and Baldwin franchises and requiring defendants to "comply with all quality control standards set forth in the Franchise Agreements."[22]

*Discussion*

I.      *Preliminary Injunction Standard*

In our Circuit, a movant seeking a preliminary injunction ordinarily must demonstrate (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships

---

[21]      May 27, 2010 Tr. 29:7-13.

[22]      May 28, 2010 Order [DI 3] ¶¶ 1-3.

On June 23, 2010, Satellite filed a petition for relief under Chapter 11 of the Bankruptcy Code, thus gaining the benefit of an automatic stay under Section 362(a). Upon Krispy Kreme's motion, however, the Bankruptcy Court on July 20, 2010 modified the automatic stay "to permit Krispy Kreme to continue to prosecute, and permit the District Court to rule upon, Krispy Kreme's request for a preliminary injunction." *In re Satellite Donuts LLC*, Ch. 11 Action No. 10-13333 (SMB) (Bankr. S.D.N.Y.), DI 33.

tipping decidedly toward the party requesting preliminary relief.[23]

The movant, however, must meet a heightened standard where the preliminary injunction (1) is "mandatory," meaning that it would alter, rather than maintain, the *status quo* or (2) would "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."[24]  Under the heightened standard, the movant must demonstrate a "clear" or "substantial" likelihood of success, rather than a mere likelihood of success.[25]  Defendants contend that the heightened standard applies here, where a preliminary injunction would both alter the *status quo* and provide Krispy Kreme with substantially all the relief it seeks by enjoining defendants from operating the franchises.[26]  There is no need to decide that question, however, as the result would be the same on either standard.

## II.     *Likelihood of Success on the Merits*

Krispy Kreme maintains that defendants defaulted on royalty, product, and brand fund payments due under the Agreements and that it terminated the Agreements upon defendants'

---

[23]
  *Citigroup Global Mkts, Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

[24]
  *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).

[25]
  *Id.* at 34.

[26]
  *See Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24-25 (2d Cir. 2004) (applying heightened standard in connection with Lanham Act claim); *Dunkin' Donuts Inc. v. Nat'l Donut Restaurants of N.Y., Inc.*, 291 F. Supp. 2d 149, 152 (E.D.N.Y. 2003) (applying heightened standard to motion for preliminary injunction enjoining defendant franchisee from operating franchise).

failure to cure the default within ten days.[27]  It claims that the continued operation of the franchises is a breach of the Agreements and unlawful under the Lanham Act.  Defendants respond that "plaintiffs failed to give defendants a reasonable opportunity to cure the alleged default"[28] and, in any event, that the Agreements were not terminated in accordance with their terms.

### A.      Default

There is no dispute that defendants were in default of the Agreements as of May 12, 2010.[29]  McCourt, whom defendants describe as the "one operating the business," the "one paying the bills," and the "person in charge,"[30] in fact concedes that Satellite "has incurred in excess of $235,000 . . . in debt to Krispy Kreme, arising from the following categories: *royalties*, note payments, and *approved products and brand fund*."[31]

The Agreements expressly require the payment of royalty, product, and brand fees and provide that the franchisor "has the right to terminate" the agreements if the franchisee "fails to make payment of any amounts due Franchsior or any of its Affiliates, and does not correct such

---

[27]

The complaint alleges that defendants owe $121,094.10 under the Agreements.  Cpt. ¶¶ 68-69.

[28]

Def. Mem. 17.

[29]

Stip Fact ¶ 11 ("As of May 12, 2010, Satellite owed Krispy Kreme monies for royalties, brand fund fees and product purchases due to Krispy Kreme.").

[30]

May 27, 2010 Tr. 20:6-12.

[31]

McCourt Decl. ¶ 42 (emphasis added); Def. Mem. 8.

failure within ten (10) days after written notice of such failure is delivered to Franchisee."[32] Defendants concededly failed to cure the default within the ten-day cure period.[33]

Defendants respond that Krispy Kreme deprived them an "opportunity to cure the alleged defaults in accordance with the Agreements and the general principals [*sic*] of good faith and fair dealing"[34] on the theory that the Default Notice allegedly overstated the amount owed and that Krispy Kreme refused to "bring in a new investor . . . who is willing to give us money."[35]  Their arguments are without merit.[36]

As an initial matter, it is undisputed that defendants owed at least tens of thousands of dollars to Krispy Kreme at the time the Default Notice was served.[37]  While there is some dispute as the precise amount owed, defendants could have (1) paid the amount they admitted was owed, (2) brought an action for a declaratory judgment regarding the disputed amount, and (3) moved for a *Yellowstone*[38] injunction tolling the cure period pending the resolution of the further amount due,

---

[32]

    *Id.* ¶ 26.2.

[33]

    Stip. Fact ¶¶ 14-15.

[34]

    *Id.* at 6; June 16, 2010 Tr. 10:22.

[35]

    June 16, 2010 Tr. 14:8-15.

[36]

    Further, defendants' arguments that (1) the doctrine of unclean hands bars the relief plaintiff seeks and (2) the Agreements' noncompetition covenant is void as a matter of "strong public policy against enjoining a person from engaging in one's chosen profession" are entirely conclusory and unavailing.  Def. Mem. 21.

[37]

    June 16, 2010 Tr. 13:10-23.

[38]

    *First Nat'l Stores, Inc. v. Yellowstone Shopping Ctr., Inc.*, 21 N.Y.2d 630, 290 N.Y.S.2d 721 (1968).

if any.[39]  This would have permitted them to obtain a definitive resolution of the dispute as to the amount of the arrearage without risking termination.  But they did not do so.  In fact, defendants concededly refused to tender any payment whatsoever.[40]

Moreover, defendants have identified no obligation on the part of Krispy Kreme to indicate with precision the amount of defendants' default under the Agreements.  The case law on which they rely is plainly distinguishable and inapposite.[41]  Krispy Kreme likewise has no obligation to allow a delinquent franchisee, who is in default of franchise agreements and other obligations, to bring in a third-party investor and participant in the franchise.

Defendants rejoin that Krispy Kreme on December 24, 2009 "promised to defer royalty payments for ingredients purchased."[42]  In so doing, they implicitly argue that there has been an oral modification of the Agreements.  The Agreements, however, contain a "no-oral-modification

---

[39]

See, e.g., *Graubard Mollen Horowitz Pomeranz & Shapiro v. 600 Third Ave. Assocs.*, 93 N.Y.2d 508, 513-515, 693 N.Y.S.2d 91, 94-96 (1999) (describing *Yellowstone* practice).

[40]

Stip. Fact ¶ 15.

[41]

June 16, 2010 Tr. 17:14-18.  Curiously, defendants rely on *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890 F.2d 165 (9th Cir. 1989), and *Ramada Worldwide, Inc. v. Sayo, Inc.*, No. 05-5506, 2007 U.S. Dist. LEXIS 96010 (D. N.J. July 10, 2007).  The *Dollar Systems* court upheld the district court's finding that a plaintiff franchisor's conduct, though negligent, "did not rise to the level of 'unclean hands.'" 890 F.2d at 173.  The *Ramada* court likewise held that it was "not convinced" that the plaintiff franchisor's "alleged misconduct is egregious or unconscionable, as is required for application of the unclean hands doctrine. In accordance with section 32 of the Lanham Act, the Plaintiff has demonstrated that the Ramada trademark is valid and legally protectable, that Plaintiff owns the trademark and that Defendants' unauthorized use of the mark was likely to cause confusion."   2007 U.S. Dist. LEXIS 96010, at *37-38.

[42]

McCourt Decl. ¶ 42.

clause,"[43] which states that, "[e]xcept as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations, or statements relating to the subject matter of this Agreement . . . . This Agreement shall not be modified except by written agreement signed by both parties."[44]  Such clauses are valid and enforceable under North Carolina law, which governs the Agreements.[45]  The express terms of the Agreements therefore preclude any modification based on Krispy Kreme's oral representations.

In consequence, defendants defaulted on their obligations under the Agreements and failed to cure them in accordance with their terms.

### B.    *Notice of Termination*

Defendants argue that Krispy Kreme failed to a deliver a proper notice of termination under the Agreements.  They maintain that the May 23 Letter is inadequate because "it is not called a notice of termination"[46] and therefore that the "Franchise Agreements at issue have not been properly terminated in accordance with their plain and unambiguous terms."[47]

---

[43]

See 2 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.6a (3d ed. 2004) ("A basic no-oral-modification clause may provide: 'This contract may be modified or rescinded only by a writing signed by both parties or their agents.").

[44]

Cpt. Ex. A ¶ 29.9.

[45]

Id. Ex. G ¶ 29.1; N.C. GEN. STAT. § 25-2-209(2) ("A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . .") (adopted from Uniform Commercial Code).

[46]

June 16, 2010 Tr. 19:22-23.

[47]

Def. Mem. 14.

Paragraph 26 of the Agreements, entitled "Termination of Franchise," provides that "Franchisor has the right to terminate this Agreement, *effective upon delivery of notice of termination to Franchisee*, if Franchisee or any of its Principal Owners or Affiliates . . . fails to make payment of any amounts due Franchsior or any of its Affiliates, and does not correct such failure within ten (10) days after written notice of such failure is delivered to Franchisee."[48]

Defendants concededly received the May 23 Letter, which states that defendants "have failed to cure the defaults specified in the [Default Notice] within the specified cure period. Consequently, the Penn Station Franchise Agreement and the Baldwin Franchise Agreement were terminated effective May 23, 2010."[49]   The Letter states also that defendants no longer "have authorization from Krispy Kreme to use its trade name, trademarks, service marks, or any other proprietary materials or products associated with Krispy Kreme."[50]   While the May 23 Letter is entitled "NOTICE TO CEASE AND DESIST" rather than "notice of termination," it states in substance that the Agreements are terminated due to defendants' failure to cure their default and that defendants' continued use of Krispy Kreme's trademark is unauthorized.[51]   Defendants' receipt of the May 23 Letter therefore satisfies the requirements of Paragraph 26 of the Agreements.

In consequence, Krispy Kreme properly terminated the Agreements in accordance

---

[48]   Cpt. Ex. A ¶ 26.2 (emphasis added).

[49]   Cpt. Ex. G.

[50]   *Id.*

[51]   Even assuming *arguendo* that the May 23 Letter is defective, defendants concede that Krispy Kreme could cure that defect if its attorney "sat down and wrote out this morning and handed to [them] a new notice of termination."  June 16, 2010 Tr. 5:1-9.

with their terms.  Defendants' continued operation of the Penn Station and Baldwin franchises

therefore is unlicensed[52] and unlawful under the Lanham Act.[53]  In these circumstances, Krispy

Kreme has demonstrated a clear and substantial likelihood of success on the merits of its claims.[54]


*III.    Irreparable Harm*

          Defendants argue that Krispy Kreme has failed to demonstrate irreparable harm

because it has not explained how defendants' continued operation of the franchises would damage

plaintiffs' trademarks or goodwill.  They maintain that "there is no legitimate concern regarding

---

[52]

  Cpt. Ex. G ¶ 16.1 ("Franchisee's right to use the Marks is derived solely from this Agreement and is limited to the performance of Franchisee's responsibilities and obligations hereunder in accordance with the terms hereof."); ¶ 27.2 (Upon termination of the Agreement, the franchisee shall "not directly or indirectly at any time or in any manner use any Mark, any colorable imitation of any Mark or any other indicia of a Krispy Kreme Store or Commissary Facility.")

[53]

  *See, e.g.*, *Sunward Electronics, Inc*, 362 F.3d at 25 ("the district court properly issued the preliminary injunction because Plaintiff will likely succeed on the merits of its underlying claim for trademark infringement" based on its finding that "Defendants are using without authorization Plaintiff's trademarks and trade name"); *id.* ("The continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes an additional trademark infringement.") (quoting *Baskin-Robbins Ice Cream Co. V. D & L Ice Cream Co.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983)); *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 45 (2d Cir. 1986) ("Because the Church has made an unrebutted case that it owned the Scientology trademarks, plaintiffs are likely to prevail on their claim for trademark infringement.").

[54]

  Further, defendants do not dispute that Krispy Kreme's proprietary information is a trade secret.  Their continued use of that information after the Agreements were terminated therefore constitutes misappropriation of a trade secret.  *See* Cpt. Ex. A. ¶ 27.2(e) (stating that franchisee must cease using franchisor's confidential information after agreement expires); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) ("A plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.") (citation omitted).

defendants' use of the Marks [] so long as the Stores continue to run in compliance with Krispy Kreme's operational standards."[55]  Their arguments are unavailing.

As an initial matter, Krispy Kreme vigorously contends that defendants' continued operation of the franchises dilutes and tarnishes its marks.  Its quality control manager indeed asserts that defendants' franchises "were failing to comply with and meet several of the most basic quality control standards governing operations of Krispy Kreme franchises."[56]  Defendants do not dispute that the value of Krispy Kreme's trademarks and proprietary information is vital to the success of its franchises.

In any event, our Circuit held in *Church of Scientology International v. Elmira Mission of the Church of Scientology*[57] that "in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case. When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is *automatic*."[58]  It recognized that:

> "the public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion.  A licensee or franchisee who once possessed authorization to use the

---

[55]

Def. Mem. 23.

[56]

Laganosky Decl. [DI 15] ¶ 11.

[57]

794 F.2d 38 (2d Cir. 1986); *see also Helene Curtis v. Nat'l Wholesale Liquidators, Inc.*, 890 F. Supp. 152, 160 (E.D.N.Y. 1995) ("[W]here a plaintiff in a trademark case has demonstrated a likelihood of success on the merits, irreparable injury almost inevitably follows and, indeed, is presumed.") (citation omitted).

[58]

794 F.2d at 42 (emphasis added); *id.* at 44 ("[A]llowing defendants the opportunity to reduce the marks' reputational value and goodwill by its continued unauthorized use constitutes the irreparable harm that is requisite to the issuance of the preliminary injunction.").

trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. . . . In this way the use of a mark by a former licensee confuses and defrauds the public. "[59]

Thus, irreparable injury necessarily follows from defendants' unauthorized and unlawful use of Krispy Kreme's trademarks.

Moreover, Paragraph 16 of the Agreements provides, among other things, that "Franchisee's right to use the Marks is derived solely from this Agreement and is limited to the performance of Franchisee's responsibilities and obligations hereunder in accordance with the terms hereof."[60]  Paragraph 29.3 in turn provides that "Franchisee and each of its Owners acknowledges that any violation of Section[] 16 . . . would result in irreparable injury to Franchisor for which no adequate remedy at law may be available.  Accordingly, Franchisee and each of its Owners consent to the issuance of an injunction at Franchisor's request . . . ."[61]  Defendants therefore expressly agreed that their continued use of Krispy Kreme's trademarks after the Agreements were terminated constitutes irreparable injury to Krispy Kreme.[62]

In consequence, Krispy Kreme has demonstrated irreparable harm.

---

[59]
    *Id.* at 44.

[60]
    Cpt. Ex. A ¶ 16.1.

[61]
    *Id.* ¶ 29.3 (emphasis added).

[62]
    *See, e.g.*, *IBM Corp. v. Papermaster*, No. 08 Civ. 9078 (KMK), 2008 WL 4974508, at *9-10 (S.D.N.Y. Nov. 21, 2008) ("While there is no authority indicating that such a contract provision entitles a plaintiff to a *per se* finding of irreparable harm, the explicit provision in the agreement and common sense indicate that IBM will be irreparably harmed by the disclosure of the important technical and proprietary information that [defendant] carries in his head.") (internal citations omitted).

16

*Conclusion*

For the foregoing reasons, Krispy Kreme's motion for a preliminary injunction is granted.

SO ORDERED.

Dated:          July 21, 2010



Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)